A. GOLDSTEIN v. UNION NATIONAL BANK ET AL.

No. 2525. Decided June 11, 1919.

**Corporation—Agency—Imputed Knowledge—Case Stated.**

A mercantile company being indebted to a bank to the full amount the law permitted it to loan to any one customer, a third party, jointly with the vice-president and general agent of the bank, executed to the bank an accommodation note which was discounted and the proceeds placed to the credit of the mercantile company. The bank by its said agent his co-maker of the note, and the mercantile company agreed that the latter should make deposits in the bank from time to time and these should be applied to discharge this note before any part thereof should be applied to other indebtednesses of depositor to the bank or checked out for any other purposes by the depositor. This application was not made, and failure to do so was plead by the defendant joining with the vice-president in making the note as releasing him when sued thereon. The entire transaction on the part of the bank was concluded by its vice-president, a co-maker of the note. Held that the knowledge of the agreement to so apply deposits on the part of its general agent, though he was personally interested as shown in the transaction, was to be imputed to the bank, and it was bound by the agreement. (Mr. Justice Hawkins and Mr. Justice· Greenwood, concurring. Mr. Chief Justice Phillips, dissenting.) (Pp. 557-574.)

Question certified from the Court of Civil Appeals for the Fifth District, in an appeal from Dallas County.

*Victor H. Hexter* and *Etheridge & McCormick,* for appellant.

As a general rule, the knowledge of an agent is the knowledge of his principal. And this rule holds good where an agent deals in a double capacity for his principal and himself at the same time where his acts are evidently designed and intended to benefit or favor the principal to his own prejudice. It is only where such agent seeks his own personal interest or advantage in the affair, without benefit to his principal, who acts for himself personally or through another agent, that his knowledge can not be held to be the knowledge of his principal. Sexias v. Citizens Bank, 38 La. Ann., 424; Traders' National Bank v. Smith, 22 S. W., 1056; Union Bank v. Wando M. & M. Co., 17 S. C., 339; First National Bank v. Erickson, 31 N. W., 387; State Bank v. Fish, 120 N. Y. S., 365; North River Bank v. Aymer, 3 Hill, 262.

A bank officer's personal adverse interest does not prevent the operation of the rule that notice to the agent is notice to his principal, where such officer is the sole representative of the bank in the transaction. Smith v. Wilson, 20 S. W., 1122; Traders' National Bank v. Smith, 22 S. W., 1056; Cook v. American Tubing & W. Co., 65 Atl., 641, 9 L. R. A. (N. S.), 211; Bank of United States v. Davis, 2 Hill, 451; First National Bank v. New Milford, 36 Conn., 93; First National Bank v. Blake, 60 Fed., 78; Holden v. New York & E. Bank, 72 N. Y., 286; National Security Bank v. Cushman, 121 Mass., 490; Loring v. Brody, 134 Mass., 453; Atlantic Cotton Mills v. Indian Orchard Mills, 147 Mass., 268, 9 Am. St., 698; Waynesville National Bank v. Irons, 8 Fed., 1; Brobston v. Penniman, 97 Ga., 527; Morris v. Georgia Loan S. & B. Co., 109 Ga., 12; Fouche v. Merchants National Bank, 110 Ga., 827; Citizens Savings Bank v. Walden, 52 S. W., 953; City National Bank v. Martin, 70 Texas, 643; Note, 29 L. R. A. (N. S.), 558; Note, 2 L. R. A. (N. S.), 993; Central Bk. & Tr. Co. v. Ford, 152 S. W., 701; Bradley v. Rickes, 9 L. R. Chan. Div. (1878), 196; Smith v. Mercantile Bank et al., 177 S. W., 72; Ledue v. Moore et al., 15 S. E., 888; Brookhouse v. Union Publishing Co., 62 Atl., 219, 2 L. R. A. (N. S.), 993; Skillern v. Arkansas Woolen Mills, 91 S. W., 303; First National Bank of Louisville v. Chowning Electric Co., 134 S. W., 1156; Mechem on Agency, vol. 2, sec. 1825, p. 1411.

*D. E. Upthegrove, T. L. Camp,* and *Walter Nold,* for appellee.

Where it is claimed that the payee of a negotiable instrument is charged with notice of an infirmity therein and the source of such knowledge is shown to be through the officer of the payee, which officer was also maker of the note jointly with another person, notice or knowledge so obtained or sought to be carried to the payee through the

medium of such maker of the note is not sufficient to charge the payee lawfully with notice. Grayson Co. Nat. Bank v. Hall, 91 S. W., 808-9; Godley Lumber Co. v. Teagarden, 135 S. W., 1114; American Nat. Bank v. Cruger, 44 S. W., 278-281; Texas Loan Agency v. Taylor, 88 Texas, 49; Harrington v. McFarland, 21 S. W., 116-117; La Brie v. Cartwright, 118 S. W., 788; Amer. Nat. Bank v. Ritz, 40 L. R. A. (N. S.), 156-9; Lilly v. Hamilton Bank, 29 L. R. A. (N. S.), 564, 566, 567; First Nat. Bank v. Foote, 42 Pac., 206-207; Bank of Overton v. Thompson, 118 Fed., 802; Breyfogle v. Walsh, 71 Fed., 902-3; Pauly v. O'Brien, 69 Fed., 460-1; Hawkins v. Ft. Natl. Bk., 175 S. W., 163.

MR. JUSTICE HAWKINS delivered the opinion of the court.

From our Court of Civil Appeals for the Fifth Supreme Judicial District come the following statement and certified question:

"The Union National Bank of Dallas instituted this suit against appellant and I. B. Walker on a promissory note for the sum of $5000, dated August 30, 1909, payable to said bank or order on demand, and bearing interest at the rate of eight per cent per annum from maturity. On May 20, 1911, the appellee, Commonwealth National Bank of Dallas, intervened in the suit, setting up that it had purchased the note, that it was the legal and equitable owner and holder thereof and entitled to the relief and judgment prayed for herein by the Union National Bank. The case was tried before the court without a jury and the trial resulted in a judgment in favor of the intervenor against appellant and I. B. Walker for the amount sued for, and the defendant Goldstein alone appealed. After demurrers and a general denial, the defendant Goldstein pleaded in the fourth paragraph of his answer as follows: 'And for special answer herein to all the pleadings against him herein, this defendant comes by attorneys and says that heretofore, towit: On or about August 30, 1909, and for some time prior thereto L. Wenar Millinery Company, a corporation engaged in business in the city of Dallas, was largely indebted to the Union National Bank of Dallas in a sum approximating twenty thousand dollars, which was the full loaning capacity of said Union National Bank of Dallas to any one person, firm, or association. That this indebtedness was carried in said bank to the extent of $15,000 in the form of notes of the said L. Wenar Millinery Company which when they came due from time to time were renewed and extended by said bank, and a part of the indebtedness was carried in said bank as an overdraft. That the loaning power of said Union National Bank was not sufficient to enable said Union National Bank of Dallas without violating the law to furnish to the said L. Wenar Millinery Company all of the money that the said L. Wenar Millinery Company sometimes required. That prior to the 30th day of August, 1909, the said L. Wenar Millinery Company and the said Union National Bank of Dallas, acting through its vice-president and general manager, I. B. Walker, and this defendant entered into an agreement, by the terms of which this defendant agreed

to execute to the Union National Bank and in conjunction with this co-defendant, I. B. Walker, and for the accommodation of the said L. Wenar Millinery Company, to a limited extent and as occasion should arise, notes to be discounted by said Union National Bank and the proceeds to be used by said L. Wenar Millinery Company in transacting its business in some way other than paying any part of its indebtedness to said Union National Bank, which was within the loaning power of said bank to lend the said millinery company, and in consideration of this defendant executing paper as aforesaid for the accommodation of said L. Wenar Millinery Company the said L. Wenar Millinery Company agreed with this defendant to make deposits in the Union National Bank of Dallas from time to time in the usual course of business, and that said deposits when so made should be applied at once to the extinguishing pro tanto of any note made by this defendant under the said agreement until the same was fully liquidated and extinguished, and that no part of said deposits should be applied to the liquidation or extinguishment of any debt or demand existing in favor of the Union National Bank of Dallas against said L. Wenar Millinery Company or be checked out for any other purposes of the said L. Wenar Millinery Company, and the said Union National Bank of Dallas agreed to discount said paper as it might be made by this defendant and to receive the deposits of the said L. Wenar Millinery Company as they were made from time to time and to apply the same exclusively to the liquidation and discharge of the notes which should be made by this defendant under said agreement until the same at any time outstanding should be fully paid off and discharged. This defendant further represents that the note sued on by the plaintiff herein and now claimed by the intervenor herein was executed by himself and his co-defendant, I. B. Walker, under the agreement and understanding aforesaid, as another note theretofore made by them had been also executed under said agreement, which other note for towit: $2500 had been also paid off in accordance with said agreement prior to the execution of the note herein sued on. That this defendant received no consideration whatever for said note, the sole consideration therefor moving to the said L. Wenar Millinery Company, which received the total proceeds of the discount of said note by the plaintiff bank. That after the discount of the note herein sued on, which was on towit: the 7th day of November, 1911, the said L. Wenar Millinery Company deposited sums of money in the said Union National Bank of Dallas daily or frequently and to the approximate extent of $4000 per month during the months of November, December, January, February and March next ensuing after execution of said note, which said deposits amounted to largely more than the principal, interest and attorneys' fees of the note herein sued on, and which deposits, so far as necessary to fully pay off and discharge the note herein sued on, belonged in equity to this defendant as a fund set aside by the said L. Wenar Millinery Company under an agreement with this defendant and with said Union National Bank of

Dallas for the discharge and retirement of the note herein sued on, and if this defendant was not in equity the owner of said fund, then-the said fund constituted an equitable security to this defendant to indemnify him against liability because of the execution by him of the note herein sued on, and this defendant became entitled to have the said deposits applied as ·they were made immediately to the liquidation pro tanto and to the ultimate entire liquidation of the note herein sued on, and it became the duty of said Union National Bank of Dallas to so apply said deposits, but the Union National Bank of Dallas failed so to apply them, and on the contrary, in violation of its agreement, applied said deposits in part to the extinguishment of indebtedness due by the said L. Wenar Millinery Company to it and in part the said Union National Bank of Dallas permitted said L. Wenar Millinery Company to check out said deposits without leaving them a sufficient. amount to pay off and discharge the obligation herein sued on. That the agreement hereinbefore mentioned was made by and· with the full knowledge of said Union National Bank of Dallas and only by virtue· of said agreement and because of the making thereof did the said Union National Bank secure from this defendant the note sued on herein, which was afterwards taken over by the Commonwealth National Bank of Dallas after maturity, and it was charged with the full knowledge of this defendant's defense thereto. And of all this defendant puts itself upon the country.'

By supplemental petition the intervenor, Commonwealth National Bank, demurred generally and specially to the foregoing paragraph of appellant's answer, the third special exception thereto being as follows: 'This intervenor specially excepts to that part of defendant Goldstein's said answer, beginning with the words "that prior to the 30th day of August, 1909," and ending with the words, "should be fully paid off and discharged," as contained on pages 2 and 3 of said defendant's amended original answer, for the following reasons, towit:

(a)   Because said agreement, if any such was entered into, was made long prior to the execution and delivery of the notes herein sued upon, and if said agreement did exist it was merged into the written contract herein sued upon and can not now be urged as a defense.

(b)   Because it is not alleged whether said agreement was oral or· in writing, and if said agreement is in writing the terms and condi-· tions are not fully and specifically set out so as to enable this intervenor to know the terms and conditions thereof; and if oral, it is an attempt to vary and contradict the express terms of the written contract herein sued upon.

(d)   If it may be construed that such an agreement was made with· I. B. Walker and that he was an officer of the Union National Bank, then it appears that I. B. Walker was adversely interested to (the) bank of which he was an officer, and such contract, if made by the said I. B. Walker, would not be binding upon the bank unless notice was

brought to the bank through some other and proper source and unless said contract was ratified by said bank.

(e) Because it is not alleged that the Union National Bank had any power or authority to force the L. Wenar Millinery Company to apply such deposits as it might make to the payment of the note herein sued upon; it is alleged that such deposits as L. Wenar Millinery Company would make were placed in the Union National Bank for the payment of said note, and it is not shown by any proper pleading that the Union National Bank had any control whatever over the deposits of the L. Wenar Millinery Company after the execution of the note herein sued upon, and unless that be true the Union National Bank could not force the application of the L. Wenar Millinery Company's money to any specified account and was wholly without authority so to do.

(f) Because it would appear that such agreement, if any, in reference to the depositing of moneys of the L. Wenar Millinery Company in the said Union National Bank, and the application of same to the payment of the note herein sued upon, was made by and between the defendants A. Goldstein and I. B. Walker and the L. Wenar Millinery Company, and it was alleged that said deposits were so made in the usual course of business, and it would not as a matter of law extinguish any debt pro tanto but would create the relation of debtor and creditor between said bank and L. Wenar Millinery Company.'

This special demurrer was by the court sustained, and that part of the defendant's answer beginning with the words: 'that prior to the 30th day of August, 1909,' and ending with the words: 'should be fully paid off and discharged,' was stricken out, and all of the balance of the paragraph of the answer quoted was held to be obnoxious to other special exceptions urged by the appellee, and was stricken out, except the following portion thereof, namely:

That the agreement hereinbefore mentioned was made by and with the full knowledge of said Union National Bank of Dallas and only by virtue of said agreement and because of the making thereof did the said Union National Bank secure from this defendant the note sued on herein, which was afterwards taken over by the Commonwealth National Bank of Dallas after maturity, and it was charged with the full knowledge of this defendant's defense thereto. And of all this defendant puts itself upon the country.'

The members of this court are not agreed upon a decision of one of the issues of law arising upon the appeal, and therefore deem it advisable to certify the question set out below to the Honorable Supreme Court of Texas for adjudication:

Question: I. B. Walker being one of the makers of the note sued on, do the allegations of the appellant's answer disclose a transaction in which the knowledge of the said Walker, as the vice-president and general manager of the Union National Bank of Dallas, of the nature of appellant's undertaking in signing the note sued on and of the

agreement to apply the deposits made by the L. Wenar Millinery Company to the payment of said note, as alleged in said answer, is imputable to said bank?"

Our consideration of this case is restricted, by statute, to the foregoing single certified question. It must be answered in the light of the certified facts. They rest in the quoted portion of the answer of the appellant, Goldstein, said question being based upon demurrers leveled at said answer.

We construe that portion of said answer as alleging, in substance, that the note sued upon was discounted by the bank, acting through its vice-president and general manager, Walker, only, but in accordance with the stated previous general agreement among the millinery company, Walker and Goldstein, on the one hand, and, on the other hand, the bank, acting by Walker alone. All parties seem so to construe said answer, and to treat such facts as involving the issue raised by said certified question.

The question, as certified, is not free from ambiguity. If before this court otherwise than upon said certified question this case might be treated as involving issues concerning (a) actual knowledge, upon the part of the bank, at the time of discounting said $5000 note, obtained otherwise than through Walker, of the terms and provisions of said general agreement, and (b) ratification, adoption and affirmance, by the bank, of said agreement, through application by the bank, in payment of the previous note for $2500, likewise made by Goldstein and Walker under said agreement, of a portion of the deposits made by the millinery company pursuant to said agreement, and by filing this suit on said $5000 note, and by maintaining it even after the filing of said answer of Goldstein, alleging the terms and provisions of said agreement.

Clearly, where a corporation having, through any duly authorized representative who is in nowise disqualified, knowledge or notice of the facts involved in the making of such a contract by such general officer in its own name and behalf, claims any benefit of such contract, the corporation must abide such contract as a whole. It can not enforce only such of the obligations as enure to its own benefit, repudiating only those which enure to the benefit of another party. Consequently, if through any authorized agent other than Walker, and with actual knowledge of said general agreement, the bank discounted said $5000 note, the bank was bound by said agreement as a whole, including said provisions for application of future deposits of the millinery company.

Clearly, also, where a contract in the name and behalf of a corporation is made by one lacking authority, or by one of its general officers whose personal interests in the transaction are adverse to those of his corporation, the corporation, after having received, through another source, full knowledge of all terms and provisions of the agreement,

may ratify, adopt and confirm it, in which event the corporation will be bound by it in all respects.

However, those phases of this case seem not to lie within the present inquiry. From the form of the certified question we presume that it was not intended to elicit an expression of our views upon them, and they are mentioned here merely by way of exclusion. The question certified, as we understand and treat it, relates solely to the status which existed, by virtue of said general agreement only, when said $5000 note was discounted by the bank, acting through Walker alone. Accordingly our decision herein is confined to the single presented issue as to whether, by virtue of said general agreement only, and disconnected from any and all allegations or issues concerning actual knowledge and ratification of it by the bank, Walker's knowledge of its terms and provisions was imputable, as a matter of law, to his bank.

Under general and well settled principles of law and equity the acts of a duly authorized agent within the scope of his authority bind the principal, and carry to him, constructively, notice of all material facts comprised in the transaction. Lending money of the bank, in ordinary course of business, was, clearly, within the scope of the authority and duty of Walker as such general officer of the bank; and, consequently, under ordinary circumstances, the bank would be held to have had notice, through him, of all the terms and provisions of said general agreement purporting to bind the bank, and by each and all of them the bank would stand firmly bound.

Applying, here, the above mentioned general principles of the law of agency, it is unquestionably true that Walker's knowledge of the terms of said general agreement, acquired by him, as it was, in the course of the very transaction through which his bank obtained said $5000 note, properly and justly is chargeable to said bank, unless the peculiar facts of this case are such as to take it out of the operation of the above stated general rule applicable to such transactions. Just here the certified question and the contentions of the parties, thereunder, arise.

Appellees contend, in substance, that this case is not within the operation of the general law of principal and agent, and that Walker's knowledge of the agreement concerning application of said deposits are not imputable to the payee bank, because, in reality, and within Goldstein's knowledge, said loan was to the millinery company, to which, under the banking laws, said payee bank was not permitted to make any additional loan, wherefore said loan constituted a fraud upon that bank; and because while handling said transactions for his bank Walker's individual interests in the premises were so adverse to those of his bank as to render it improper and inequitable to hold said bank chargeable with his so acquired knowledge of the terms of said general agreement.

To said claim of fraud the obvious answer is that said loan was not made to the millinery company. The note taken therefor was signed

by Goldstein and Walker, individually, and not by the millinery company, and that company never became liable thereon as an undisclosed principal, and thereby the antecedent indebtedness of the millinery company to the bank was not increased. Inasmuch as the transaction constituted no violation of the banking law it was not, for that assigned reason, a fraud upon the bank. Moreover, even if the millinery company had been an avowed obligor upon said note the entire matter of over-loan would have been one solely between the government and the bank, not affecting the validity of the loan or the ordinary contractual liabilities or obligations of the parties. Mining Co. v. Bank, 96 U. S., 640; Wyman v. Bank, 29 Fed., 734; In re Edom, 119 Fed. Rep., 487.

Upon the issue relating to Walker's alleged adverse interests there is some difficulty, which probably arises, mainly, from loose thinking and looser expression, by various courts and text-writers, on the general subject. Combating the theory that Walker's interests in the transactions were disqualifyingly adverse to those of his bank, and pointing to the fact that in all the recited transactions said bank acted by and through Walker, its vice-president and general manager, and none other, plaintiff in error strongly invokes the doctrine known as that of "sole representative," which is to the effect that a corporation must be held bound by the knowledge of its agent, at least when acquired in the course of the immediate transaction, whenever such agent, even though he acts in his own interests, also, is the only representative of the corporation in the premises.

The doctrine of "sole representative" frequently has been applied as sound, especially in cases where, as in this instance, the only representative of the corporation in the transaction was one of its officers. Cook v. Tubing Co., 28 R. I., 41, 65 Atl., 641, 9 L. R. A. (N. S.), 193; Brobston v. Penniman, 97 Ga., 527, 25 S. E., 350; Morris v. Banking Co., 109 Ga., 12, 46 L. R. A., 506, 34 S. E., 378; Fouche v. Bank, 110 Ga., 827, 36 S. E., 256; Bank v. Kellogg, 4 S. D., 312, 56 N. W., 1071; Bank v. New Milford, 36 Conn., 93; Le Duc v. Moore, 111 N. C., 516, 12 S. E., 888; Smith v. Bank (Tenn.), 177 S. W., 72; Holden v. Bank, 72 N. Y., 286; Bank v. Blake, 60 Fed., 78; Note to Lilly v. Bank, 29 L. R. A. (N. S.), 558; Note to Bank v. Burns, 49 L. R. A. (N. S.), 764. See, also, Note to Brookhouse v. Pub. Co., 2 L. R. A. (N. S.), 993.

Concerning the true ground upon which that doctrine rests there is great contrariety of opinion. "The rationale of the rule has been differently stated by different judges. By some, it has been rested entirely upon the presumption of an actual communication between the agent and his principal; by others, upon the legal conception that for many purposes the agent and principal are regarded as one." 2 Pom. Eq. Juris., sec. 666. Mechem on Agency (1889), sec. 719.

An additional ground for the rule of *imputed knowledge* has been mentioned by this court, as follows: "By others, it is placed upon the ground that when a principal has consummated a transaction in whole or in part through an agent it is contrary to equity and good con-

science that he should be permitted to avail himself of the benefit of his agent's participation without becoming responsible as well for his agent's knowledge as for his agent's act." Irvine v. Grady, 85 Texas, 120, 19 S. W., 1028.

Many cases wherein that doctrine has been rejected assume that the principal may be held bound by the transaction solely upon the presumption of communication by the agent to the principal of all material and relevant facts within his knowledge, and then declare it unreasonable to presume that such communication will be made by the agent in a transaction wherein his interests are adverse to those of his principal, especially where the transaction is beneficial to the agent and detrimental to the principal.

But we do not consider it necessary, *in all instances,* in order to bind the principal by such knowledge of the agent, to rely exclusively upon any presumption as to such communication by the agent. 85 Texas, 120; Morris v. Banking Co., supra, and authorities therein cited.

In discussing knowledge of a bank director as constituting notice to his bank, Mr. Wade, in his treatise on the Law of Notice, 2d ed., sec. 683a, said: "Where he acts for the corporation in the transaction of the business in respect to which it is sought to charge it with notice; as where he, as one of the board of directors, authorizes the discount of a note procured by fraud, of which he had notice, the bank would be bound as though his knowledge had been communicated to the entire board. When the fact in question comes to the knowledge of a director or other officer when he is making authorized official inquiry, or is otherwise engaged officially for his principal, it can be of no consequence that he fails to communicate it," citing cases. The same author declares: "The restriction of the rule to cases where there is a probability that the agent will communicate the knowledge seems to have had its origin in a total misapprehension of the purposes for which the rule was established. It tends to defeat the application of the doctrine to cases where it is most essential in the promotion of good faith and fair dealing." Judge Story, in his work on Agency, sec. 140, said: "Notice of facts to an agent is constructive notice thereof to the principal himself, where it arises from, or is at the time connected with the subject matter of his agency; for, upon general principles of public policy, it is presumed that the agent has communicated such facts to the principal; and, if he has not, still the principal, having intrusted the agent with the particular business, the other party has a right to deem his acts and knowledge obligatory upon the principal; otherwise, the neglect of the agent, whether designed or undesigned, might operate most injuriously to the rights and interests of such party."

Wholly apart from the matter of such presumptions there is, in the authorities, much to support the view that where a corporation's only representative in a transaction lying within the scope of his authority is one of its general officers he is its *alter ego,* and, consequently, any

material knowledge which he acquires in the course of the transaction is chargeable directly to such corporation.

In Bank v. Burns, 103 N. E., 93, 49 L. R. A. (N. S.), 764, wherein the bank was held chargeable with its president's and general manager's knowledge of facts which invalidated notes transferred to it by him, the Supreme Court of Georgia said: "In determining the rule of law that shall apply in this case, in the interest of sound morals, the public welfare, and honest business, this court has a most important duty to perform. Today probably 90 per cent of the country's business is conducted or controlled by the corporation. It is not only a business convenience, but a business necessity. Its business can not be conducted by the invisible, intangible, incorporeal body known in the law, but must be conducted by its officers and agents as known to the public. The agent, when duly authorized to act, stands in the shoes of his principal for the purposes of the corporation, as the principal must be held to stand in the shoes of the agent for the protection of the public. There is a full and complete merger of identity—a oneness in action and knowledge—of principal and agent. If there be that legal identity as to the act of the agent in behalf of his principal, it must follow by a parity of reason and right that there be that same legal identity as to the agent's acquired knowledge in the doing of the principal's act; and, if so, why should there be either occasion or duty on the part of the agent to communicate the knowledge to his principal—which knowledge, by virtue of said identity between the agent and principal, the principal must be conclusively presumed to have? Or, as Mechem has said: "Whatever notice or knowledge, then, reaches the agent under these circumstances (matters within the scope of his authority), in law reaches the principal." (Sec. 719.) Boesel, as manager of the bank, can not unknow what Boesel the man all the while knew. . . . The agency of Boesel as president and active manager of the bank is admitted; second, what he did as such agent was fully authorized by the bank. This is conclusively established by the fact that the bank at no time repudiated the transaction or questioned the agent's authority, but, on the contrary, continued to hold said notes, brought suit upon them, and is now prosecuting error for a reversal of the judgment below. Again, in this case it is admitted only that Boesel as president and active manager of the bank was fully authorized as such to purchase the notes, but that no other person, officer, committee, or board of directors needed to take any action whatsoever to complete such purchase. Again, this is a case in contract, whereas many of the cases cited are those in tort. . . . In a case of contract, as in the case at bar, there is no need of communicating knowledge, because the principal in law is already conclusively presumed to have that knowledge. The principal's liability does not depend upon the agent's duty to communicate, or the likelihood that he will communicate, his knowledge to the principal, but upon the fact that the agent is the *alter ego* of the principal, acting for the principal,

and knows that his acts and knowledge *ipso facto* become the knowledge and acts of the principal. This doctrine of liability based upon the legal identity of the parties is in the main sustained by a number of cases. Messick v. Rozbury, 1 Handy (Ohio), 190, 191; Cragie v. Hadley, 99 N. Y., 131, 52 Am. Rep., 9, 1 N. E., 537."

In Bank v. Cushman, 121 Mass., 490, it was said: "If a director of a bank, who acts for the bank in discounting a note, has knowledge that the note was procured by fraud, the bank is affected with his knowledge."

Even in Innerarity v. Bank, 139 Mass., 332, 52 Am. Rep., 710, 1 N. E., 282, the court said: "A bank or other corporation can act only through agents, and it is generally true that, if a director who has knowledge of the fraud or illegality of the transaction acts for the bank, as in discounting a note, his act is that of the bank, and it is affected by his knowledge."

The Rhode Island Supreme Court concluded: "We are constrained to hold with these cases, upon grounds of public policy which require that a corporation shall be held responsible for the knowledge which is possessed by those whom it appoints to represent it. From the nature of its constitution, it can have no other knowledge than that of its officers, and, in dealing with such officers, as with the corporation itself, third parties have a right to consider that what they know it knows. Indeed, when the presiding officer of a corporation is intrusted with the transaction of its business, with full power to bind the corporation in respect to such business, it seems more proper to call the knowledge which he has actual knowledge of the corporation rather than to say it is imputed." Cook v. Tubing Co., *supra*.

However, it is not clear that the doctrine here under review is applicable, upon any ground or for any reason, to *all* transactions wherein a corporation is represented by a single agent, even though he be one of its general officers; and especially does that indicated doubt apply to transactions involving issues of fraud and to transactions wherein the individual interests of such officer may be found to be distinctly and materially adverse to those of the corporation. Application of said doctrine to the facts of this case, with the logical result that, thereunder, the payee bank would be held chargeable with Walker's knowledge of the agreement for application of future deposits of the millinery company, certainly would work no practical injustice in this particular instance; but, in the opinion of this writer, that is true because, under the certified facts, as this writer understands them, Walker's knowledge in the premises fairly is imputable to his bank under the general law of principal and agent, and quite independently of the doctrine of "sole representative."

The doctrine mentioned unquestionably operates justly and benignly, and in consonance with common honesty and sound public policy, in many instances, and, apparently, would do so in the case at bar; but, possibly, not so in all instances; wherefore this court is not committed

to that doctrine as establishing a general rule. Whether it be sound, as a general rule, or not, there seems to be no real necessity for applying it in this case. Irvine v. Grady, *supra.*

In dealing with a kindred question this court, in that cited case, said: "A difficulty we have encountered in the attempt to determine whether the rule of imputed knowledge should apply in such a case, grows out of the fact that the authorities are not in accord as to the principle upon which the doctrine rests. By some it is held that the rule rests upon the principle of the legal identity of the principal and agent. Boursot v. Savage, 2 L. R. Eq., 134. By others, it is placed upon the ground, that when a principal has consummated a transaction in whole or in part through an agent, it is contrary to equity and good conscience that he should be permitted to avail himself of the benefits of his agent's participation without becoming responsible as well for his agent's knowledge as for his agent's act. Le Neve v. Le Neve, 2 Lead. Cases Eq., 4 Am. Ed., 109, and Am. note 179. The doctrine of the identity of the principal and agent, as applied to the mere question of imputed notice, seems technical and arbitrary, and if broadly applied would extend the rule so as to embrace cases in which its operation would be manifestly unjust. The latter, in our opinion, is the more reasonable and equitable foundation of the rule, and it gives a more salutary operation. . . . Another reason that is sometimes given for the doctrine that notice to agent is notice to the principal is, that it is the duty of the agent to communicate his knowledge to the principal, and he is therefore 'irresistibly presumed' to have communicated it. Boursot v. Savage, supra. This would seem rather a deduction from the doctrine that it is inequitable for the principal to avail himself of the agent's acts without being held to know what the agent knows, rather than an independent foundation for the rule of constructive notice." See, also, La Bue v. Cartwright, 118 S. W., 785; Bank v. Harrell, 159 S. W., 858; Lilly v. Bank, *supra;* Gunster v. Illuminating Co., 181 Pa. St., 327, 59 Am. St. Rep., 650 and c. c.; Mechem on Agency, 2d ed., sec. 177.

Upon the issue relating to adverse interests it must be conceded that in decisions of various courts, and in statements of the law by some text-writers, there may be found certain expressions to the effect that if, in a given transaction, the individual interests of an agent are to any extent adverse to that of his principal, the knowledge of such agent, although acquired in the course of that very transaction, is not binding upon his principal, because, under such circumstances, it is not to be presumed that an agent, so adversely interested, will disclose to his principal his own knowledge in the premises; but we consider such expressions inaccurate in that they go too far and state too much.

In other quarters it has been declared that the exception involving adverse interests prevails "in cases of such conduct by the agent as raises a clear presumption that he would not communicate the fact in controversy, as where the agent acts for himself in his own interest

and adversely to that of the principal." 1 Am. & Eng. Ency. of Law, 1145; Harrington v. McFarland, 1 Texas Civ. App., 289, 21 S. W., 116; Bank v. Ritz, 70 W. Va., 409, 74 S. E., 679, 40 L. R. A. (N. S.), 156.

The rule, and its exceptions, have been stated thus: "The law imputes to the principal, and charges him with all notice or knowledge relating to the subject matter of the agency which the agent acquires or obtains while acting as such agent and within the scope of his authority, or according to the weight of authority, which he may previously have acquired, and which he then had in mind, or which he had acquired so recently as to reasonably warrant the assumption that he still retained it. Provided, however, that such notice or knowledge will not be imputed: (1) where it is such as it is the agent's duty not to disclose; (2) where the agent's relations to the subject matter are so adverse as to practically destroy the relation of agency; and (3) where the person claiming the benefit of the notice, or those whom he represents, colluded with the agent to cheat or defraud the principal. This rule does not depend, in either case, upon the fact that the agent *has* disclosed the knowledge or information to his principal; subject to the exceptions named, the law conclusively presumes that he has done so, and charges the principal accordingly." Mechem on Agency, 2d ed., vol. 2, sec. 1813. See, also, sec. 1825.

Eliminating from consideration the elements of actual knowledge through another source, and ratification, the true test, as to notice, in cases of this character, is, we think, not whether there is some slight adverse interest existing in the agent, although, to much greater extent, his individual interests in the transaction are entirely consistent with the interests of his principal, but whether, in the premises, and under all the circumstances of the particular case, the agent's interests are so incompatible with the interests of his principal as practically to destroy the agency or to render it reasonably probable that an ordinary person, in the agent's position, under such circumstances, will neither act, in behalf of his principal, upon his so acquired knowledge, nor disclose that knowledge to his principal, but, because of such incompatibility in interests, will withhold such knowledge from the principal.

We do not find presented, in this instance, such facts as would justify a court in holding, as a matter of law, that Walker's general agency did not exist throughout the making of said general agreement, or that his individual interests in the premises were so adverse to those of his bank as reasonably to induce and compel, in the mind of an ordinary person, situated as was Goldstein, the conclusion that Walker would neither enforce, on the part of his bank, said agreement for payment of said $5000 note out of future deposits of the millinery company, nor inform some other officer of said bank of the terms of said agreement. Wherein, if at all, did said general agreement involve serious antagonism between the individual interests of Walker and the practical and material interests of his bank? Said loan seems to have been

made in regular course of the bank's business, and within the scope of Walker's authority as a general officer of his bank, and the note was retained and sued on by the payee. The bank was in the business of lending money, under Walker's supervision, presumably profiting from interest payments. It is not alleged that Goldstein, or Walker, or the millinery company, at any time was insolvent, nor does it appear that in any respect said $5000 loan was undesirable from the standpoint of the bank. Moreover, an inducing though merely incidental benefit to the bank was the fact that the money loaned to the accommodation makers of the note would go, as a loan from Goldstein and Walker, into the business of a concern already indebted, largely, to said bank.

Furthermore, it is not shown here that when said agreement was made said bank was uneasy, or had cause to be uneasy, about said preexisting debt of the millinery company in its favor, or then even desired that all or any portion of that debt be paid at any particular time, or out of such future deposits, if any should be made. It is true that if applied in satisfaction of said Goldstein-Walker demand note said deposits certainly would remain, for a time, in the hands of said bank, and thereby the bank would be freed from any right of the depositor growing out of the deposit thereof; but it is not shown that at date of said agreement the best interests of the bank then, or in future, would require that any note of Goldstein and Walker to said bank should be paid at any particular time, or out of such specified future deposits, nor is it shown that but for said agreement such future deposits would have been left in said bank, to its profit, for any definite period of time. From every viewpoint the attitude of the bank with reference to the disposition or application of such future deposits, if any, seems to have been, largely, one of indifference. At any rate, upon comparison of the interests of the bank and those of Walker, in the premises, as of date of said general agreement, it certainly can not fairly be said that, as a matter of law, "the agent's relations to the subject matter are so adverse as to practically destroy the relation of agency."

It must be conceded that Walker's individual interests, as a joint obligor on said note, plainly called for application of the necessary portion of said deposits in full payment of said note, in strict accordance with said agreement, upon which, it seems, he and Goldstein relied as an inducement for signing said note; but, that is not shown to have been distinctly detrimental to the bank, and, under the circumstances, and because of that very self-interest of Walker, as well as because of said agreement made by him, in behalf of his bank, with Goldstein and the millinery company, Goldstein reasonably might expect that Walker, acting in behalf of his bank, would enforce the terms of said agreement, or even that he would notify some other officer or agent of his bank of the terms thereof, in order that said $5000 note certainly should be fully paid out of such deposits, thereby terminating

the personal liability of both Walker and Goldstein upon that note. It is not averred, and it can not be assumed, that the payee bank would be benefited by such application or disposition of such future deposits, if any, as was made, afterward, more than it would have been benefited by the stipulated application thereof, *pro tanto,* in payment of said $5000 note.

It has been suggested that the payee bank should not be held chargeable with Walker's knowledge of the terms of said agreement for the payment of the $5000 note out of future deposits by the millinery company, because such application of such deposits, while evidently beneficial to Walker, would be inimical to the bank's interests and prejudicial to what is sometimes called its general "banker's lien," in that such application of such deposits would prevent the bank from applying them upon said pre-existing indebtedness of the millinery company to the bank. A sufficient reply, under the circumstances, even as related to the portion of said pre-existing debt which was due at date of said general agreement, lies in the fact that, according to the allegations of Goldstein's answer, the only deposits of the millinery company which were to be applied by the bank, under said general agreement, in payment of said $5000 note, were deposits to be made *in future* and *for the express purpose of paying that note.* Presumably said payee bank had no legal means of compelling the millinery company to deposit its funds in that bank, and the millinery company stood legally free to deposit its funds elsewhere, and, consequently, likewise free to stipulate, as it did, in substance, as a part of said general agreement, that a sufficient portion of such deposits as it might thereafter make in said bank should be treated as *special deposits* and should be applied in full payment of said $5000 note. By the terms of said agreement, and up to that amount, those deposits were not to become subject, at any time, to any equitable lien or claim by the bank for securing or paying all, or even the matured portion, of said antecedent debt of the millinery company to that bank.

Some courts and various text-writers have, indeed, indicated, in general terms, that a bank has an equitable "lien" upon deposits in its hands to secure obligations of the depositor in favor of the bank; but sound reason and practically all the authorities are to the effect that even general deposits can not be applied upon any such obligation unless and until the depositor's debt to the bank shall have matured, or the depositor shall have become insolvent, or, as is held in some States, shall be about to become insolvent, in which last mentioned instance, according to some decisions, the bank may obtain a decree of court authorizing such application of general deposits. Newmark on Bank Deposits, secs. 117 and 120; Bolles on Banks and Their Depositors, sec. 390; Michie's Banks and Banking, secs. 137 and 134; Morse on Banks and Banking, 5th ed., sec. 329; 7 Corpus Juris, secs. 351-353; Note in Ann. Cas., 1915A, p. 688, and numerous decisions therein cited; Gin Co. v. Bank, 89 Texas, 147, 33 S. W., 862; Bank v. Cresson, 75 Texas,

298, 12 S. W., 819; Schoelkopf v. Phillips, 88 Texas, 31, 29 S. W., 645; Savings Bank v. Renfro, 57 Texas Civ. App., 160, 122 S. W., 37; Bank v. De Morse, 26 S. W., 417; Templeman v. Hutchings, 24 Texas Civ. App., 1, 57 S. W., 868; Neely v. Bank, 25 Texas Civ. App., 513, 61 S. W., 559; Owen v. Bank, 36 Texas Civ. App., 490, 81 S. W., 988; Presnall v. Bank, 151 S. W., 873; Sperlin v. Loan Co., 103 S. W., 232; Allbright v. Aldrich, 2 Texas, 166; Castro v. Gentiley, 11 Texas, 28; Henderson v. Gilliam, 12 Texas, 71; Hamilton v. Hook, 26 Texas, 302; Bank v. Townsend, 147 S. W., 617; Mfg. Co. v. Bank, 42 S. W., 573.

However, while the qualifications upon the enforcement of such "lien" are as above indicated, many statements of the rule itself disclose not only an inapt and unwarranted use of the word "lien," but an inaccurate expression of the law applicable in such cases; the real fact being that, upon principle, and also according to the overwhelming weight of authority, the actual and only right or privilege of the bank in such instances is that of "set-off," which the bank is permitted, in equity, to exercise, in recognition of the fact that if sued for the amount of such deposits it successfully could plead "set-off."

It is elementary that the making and acceptance of an ordinary deposit creates, as between the bank and the depositor, the relation of debtor and creditor, and, except for such equitable right of set-off, the bank must pay, upon demand of the depositor, the full amount of such deposits. Obviously such right of set-off does not extend and can not be exercised by the bank with reference to special deposits made pursuant to prior agreement between the depositor and a third party, and with the knowledge and acquiescence of the bank, for the purpose of paying an obligation of the depositor to such third party. To hold otherwise would, in many instances, subject special deposits to application by the bank in satisfaction of debts in its own favor—a thing which is inequitable and contrary to public policy.

Such right of "set-off," then, not being applicable to special deposits, the obligation of the bank to apply the special deposit to the designated use is absolute; and that obligation inures in the very instant in which such deposit is made. The special character of the future deposits in the case at bar is emphasized by the provisions of said pre-existing general agreement, which both determined and specified their purpose.

In no practical sense, therefore, was Walker's action, in agreeing, on behalf of his bank, to the application of such future special deposits in payment of said $5000 note, adverse to any then existing substantial interest of said bank. It follows that, under the general rules of agency, Walker's knowledge of the terms of said general agreement was imputable to and binding upon his principal, said payee bank. The certified question is answered affirmatively. That conclusion seems consonant with reason and justice and sound public policy and it is supported by authority. Bank v. Ford, 152 S. W., 700 (writ of error refused by this court); Bank v. Smith, 22 S. W., 1056; Bank v. Electric Co. (Ky.), 134 S. W., 1156; Bank v. New Milford, 36 Conn., 93; Smith

v. Wilson, 20 S. W., 1122; Skillern v. Woolen Mills (Ark.), 91 S. W., 303; Bank v. Irons, 8 Fed., 1.

MR. JUSTICE GREENWOOD delivered the following concurring opinion:

I concur in the answer that the allegations of appellant's answer disclose a transaction in which the knowledge of Walker, as sole representative of the bank in consummating the transaction, is imputable to the bank.

The bank could not act alone through its vice-president and general manager in discounting the note, in consummation of the previous agreement, and escape the consequences of the knowledge of its vice-president and general manager.

The cases of Morris v. Georgia Loan, Savings & Banking Co., 46 L. R. A., 511; Bank v. Burns, 49 L. R. A. (N. S.), 768 to 780, and Brobston v. Penniman, 97 Ga., 528, seems to me to state sound rules which should govern the determination of the question certified.

### DISSENTING OPINION.

MR. CHIEF JUSTICE PHILLIPS delivered the following dissenting opinion:

I do not regard this as a sound decision. I therefore enter my dissent.

It is evident that Walker's interest in the transaction was adverse to that of the bank, his principal, to which he owed scrupulous fidelity and open dealing. The effect of the transaction was to divert a security—the deposits—which the bank had for the debts of the millinery company, for the private advantage of Walker and Goldstein. This is obvious, since the agreement would not have been proposed but for the benefit of Walker and Goldstein which, at the expense of the bank, would ensue from it. One acting for his own private interest and so as to obtain an advantage of his principal, can not pretend to act for his principal; and for the sake of honesty the law, in such a transaction, refuses to regard him as the representative of his principal. For the same reason it refuses to permit others who know the facts and who join with the pretended agent in the transaction for their own advantage at the expense of the principal, to treat him as an agent of the principal. They can not in their own interest collude with the so-called agent for the betrayal of the principal's interest, and then say,—with the fruits of the conspiracy, obtained from the principal, in their hands or applied to their uses—that the unfaithful action of the agent was the action of the principal.

It was to the interest of Walker not to communicate the transaction to the bank. It was to his advantage to remain silent, as it appears he did. Goldstein must have known this. It was equally to his interest that Walker should remain silent. He was helping Walker to obtain the bank's money for his own benefit in a character of transaction which

he was bound to know the disinterested officials of the bank would repudiate if they knew of it. He was an active participant in the transaction, a direct beneficiary of it. He knew that it was necessarily prejudicial to the bank for its security for other debts to be diverted for the protection of his and Walker's liability upon this debt. He profited by the transaction at the expense of the bank. He can advance no claim of innocence. He is, therefore, in no position to say that Walker's knowledge was the bank's knowledge.

It does not appear from the certificate what the interest of Goldstein and Walker in the millinery company was, but it may be assumed that it was not philanthropic. It little matters what their interest was. They obtained the bank's money, and are responsible for its return.

That Walker alone acted in the pretended interest of the bank does not affect the question. Nor does it alter the result. Walker did not have the exclusive management of the bank. It does not appear that the bank did not have other officers and a board of directors as required by law, and which it will be presumed, therefore, it did have,—disinterested officers and directors. It is not believable that the disinterested representatives of the bank would have approved the transaction had they known the facts. That no real representative of the bank acted with Walker could not and did not qualify him as its representative. His self-interest, under the facts pleaded, disqualified him absolutely. Goldstein's knowledge of Walker's self-interest, his equal participation in the transaction and his equal appropriation of its benefits with that knowledge, all place him in the attitude of active collusion with Walker for the sacrifice of the bank's interest, and as strongly deny him any right to say that Walker was its representative. He was a party to the wrong done the bank by the transaction, and should not be allowed to derive any advantage from it. Certainly, under such circumstances he will not be permitted to rely upon a means of notice which he was bound to know did not lead to the bank itself through its disinterested officers or directors.

The rule which imputes to the principal the knowledge of his agent is for the benefit of innocent third parties. It is their innocence which furnishes the reason for the rule. There are instances where, to avoid wrong to innocent persons, the agent's self-interest in the transaction where he, alone, acts for the principal, is held not to vary the operation of the rule. Morris v. Georgia, etc., Co.; Bank v. Burns, and Brobston v. Penniman, cited from other jurisdictions as supporting this decision, are cases of that kind. In each of them, the persons in whose favor the rule was allowed to operate, were innocent of the agent's wrong to his principal and not the beneficiaries of it. A loss would have been visited upon persons not at fault had the principal not been held to the agent's knowledge. Such cases are maintainable under the maxim that where one of two innocent persons must suffer for the wrong of another, the loss will be visited upon him who makes possible the infliction of the wrong. They furnish no authority upon the question here.

As I have endeavored to emphasize the rule which charges the principal with the knowledge of the agent is for the protection of innocent third persons. It can not be availed of by those who use, or collude with, the agent in the perpetration of a fraud upon the principal.