United States Court of Appeals,

Fifth Circuit.

No. 91-6315.

FEDERAL DEPOSIT INSURANCE CORPORATION, etc., Plaintiff-Appellant,

v.

SHRADER & YORK, etc., et al., Defendants-Appellees.

May 20, 1993.

Appeal from the United States District Court for the Southern District of Texas.

Before DAVIS and JONES, Circuit Judges, and PARKER[1], District Judge.

W. EUGENE DAVIS, Circuit Judge:

The Federal Deposit Insurance Corporation (FDIC) appeals the summary judgment dismissal of its legal malpractice action against the law firm of Shrader & York, its individual partners, and successor organizations (Shrader & York). We affirm.

I.

A.

The FDIC brought this legal malpractice action against Shrader & York in May of 1991. It alleges that Shrader & York negligently contributed to the failure of two of the law firm's clients, City Savings & Loan Association (City), and Lamar Savings Association (Lamar). Specifically, the FDIC points to work Shrader & York did on the following five transactions: (1) City's acquisition of Realty Development Corporation (RDC) in 1983; (2) Lamar's merger with Brazos Savings Association (Brazos) in 1983; (3) the 1984 sale by a Lamar subsidiary of property known as 8214 Westchester; (4) Lamar's acquisition of CTC (USA) Corporation (CTC) in 1985; and (5) Lamar's 1985 purchase of Stone Oak Corporation (Stone Oak).

The district court granted summary judgment in favor of the defendants, relying on the following grounds: (1) the Texas two year statute of limitations for legal malpractice claims expired before the FDIC acquired City and Lamar; (2) the FDIC lacked standing to sue Shrader & York for

[1]Chief Judge of the Eastern District of Texas, sitting by designation.

legal malpractice;  (3) the individually named defendants were not partners in the law firm at the time of the alleged acts of malpractice;  and (4) the law firm's alleged acts of malpractice could not have proximately caused the losses alleged by the FDIC, 777 F.Supp. 533.  This appeal followed.

B.

Stanley E. Adams, Jr. (Adams) and his wife, Christie Bell, purchased Lamar in 1969.  In 1979 Adams formed Lamar Financial Corporation (LFC) as Lamar's holding company.  In 1983 LFC purchased City.  Adams served as chairman of the board of directors and chief executive officer of Lamar from January of 1980 through December of 1985;  as a director of LFC during the same time period, and as chairman of the board of directors of LFC from January of 1983 through December of 1985.  Adams served as City's vice president from January of 1983 until May of 1986, and as a director of City from December of 1985 to April of 1986.  From December of 1985 until October of 1986, Adams owned 100% of City's stock.  In February of 1992, Adams pled guilty to conspiracy to defraud the United States, and false entries in savings association records, in violation of 18 U.S.C. §§ 371, 657, 1006, and 1001.

On May 18, 1988, the Federal Home Loan Bank Board (FHLBB) determined that City and Lamar were insolvent, and appointed the Federal Savings and Loan Insurance Corporation (FSLIC) as their receiver.  The FSLIC-Receiver sold to the FSLIC, in its corporate capacity, City and Lamar's claims against professionals providing services to these thrifts.  The FDIC acquired these causes of action by operation of § 401 of the Financial Institutions, Reform, Recovery and Enforcement Act of 1989 (FIRREA).

The FDIC alleges that Shrader & York contributed to the collapse of City and Lamar by doing faulty legal work in the five transactions at issue.  With respect to all five transactions the FDIC alleges that Shrader & York failed to give City and Lamar competent legal advice to the point that some transactions violated federal laws.  The FDIC contends that Shrader & York allowed Adams to deceive the Lamar and City directors.  According to the FDIC's theory of the case, if Shrader & York had alerted the City and Lamar boards of the illegal nature of the five transactions, the boards would have blocked the transactions, thereby averting huge losses.  The FDIC describes the five

transactions as follows:

1. City's acquisition of RDC: In 1983 City paid $30 million for RDC, a troubled asset. RDC's principals then purchased $10 million of LFC preferred stock. Thus LFC used the RDC acquisition to funnel $10 million of City's cash to LFC, allowing LFC to repay the loan LFC secured to purchase City. The FDIC contends that this violated federal regulations prohibiting a holding company's subsidiary thrift from investing its funds in an affiliate's obligation. The FDIC further contends that Shrader & York knew that the transaction was unlawful, but failed to inform any disinterested officer or director of City. According to the FDIC, City's losses from the RDC acquisition exceeded $5 million.

2. Lamar's acquisition of Brazos: In July of 1982 Lamar agreed to acquire Brazos. The acquisition agreement provided that compensation to Brazos officers and directors would increase only in the ordinary course of business, and that Lamar and Brazos would bear their own merger expenses. In July of 1983 Shrader & York certified that the merger complied with the acquisition agreement and applicable laws. The FDIC claims that Shrader & York failed to report numerous violations of the merger agreement. For example, the FDIC alleges that Brazos paid $155 thousand of Lamar's merger-related expenses. More significantly, the FDIC alleges that officers and directors of Lamar and Brazos wasted nearly $8 million in Brazos assets through conduct such as (1) paying nearly $1 million in bonuses to senior officers of Lamar and Brazos; (2) giving 71 automobiles to officers, directors and employees of Lamar, City, and Brazos; (3) giving Rolex watches to Brazos directors; (4) constructing a greenhouse at Adams's house and an airstrip at Adams's ranch; and (5) buying a $72 thousand diamond ring for Adams's wife.

3. Lamar's sale of 8214 Westchester: Lamar loaned $10.5 million to Drew Mortgage Company, an entity owned by Lamar and City, for development and construction of 8214 Westchester, Lamar's Dallas headquarters. The FDIC alleges that in 1984 Shrader and York formed a limited partnership, 8214 Westchester Ltd., to purchase the property. The limited partnership borrowed $15 million in purchase financing from Mainland Savings (Mainland). Mainland participated $8.8 million of the loan back to Lamar. Later, Lamar purchased the remaining $6.2

million of the loan. The FDIC claims that the sale was a scheme to avoid classifying the loan as a non-performing depreciable asset, for 1984. It also alleges that Lamar lost $4 million on this transaction.

4. Lamar's acquisition of CTC: In 1985 Lamar made a direct investment in CTC, a software development corporation. The FDIC alleges that Lamar's regulatory capital was below the minimum level necessary to make direct investments unsupervised by federal regulators. The FDIC further alleges that Shrader & York prepared the documentation for the investment, but failed to advise Lamar's board of directors of the need to obtain regulatory approval for the investment. The FDIC alleges that Lamar lost over $1 million on the transaction.

5. Lamar's purchase of Stone Oak: In 1985 Lamar and LFC acquired Stone Oak, a real estate development corporation, for $84.2 million. Again, the FDIC alleges that Lamar had insufficient regulatory capital to make unsupervised direct investments. It alleges that Shrader & York failed to advise Lamar's board of the need to obtain prior approval of the investment. The FDIC alleges that Lamar lost $25 million on the investment.

## II.

Because the FDIC's standing to sue is a threshold inquiry, we deal with it first. The district court concluded that the FDIC's standing to sue Shrader & York was based on Lamar and City's shareholders' right to sue. Because the shareholders lacked standing, the district court concluded that the FDIC also lacked standing.

The FSLIC-Receiver, as successor to Lamar and City, acquired all of the two thrifts' assets, including their claims against Shrader & York. 12 C.F.R. §§ 548.2(f), 549.3 (FSLIC regulations in effect at the time the FSLIC was appointed receiver of City & Lamar). The FSLIC-Receiver then assigned these to the FSLIC-Corporate. See 12 U.S.C. § 1729(f)(2)(A) (1989). By operation of FIRREA, the FSLIC was abolished and the FDIC succeeded to all of the FSLIC's assets. 12 U.S.C. § 1821a(a)(1). The FDIC therefore has standing to sue Shrader & York.[2]

## III.

_____

[2]We discuss the FDIC's standing in further detail in section III of this opinion.

The district court concluded that City and Lamar's legal malpractice claims against Shrader & York were time barred before the FSLIC acquired them on May 18, 1988. FIRREA's statute of limitations, 12 U.S.C. § 1821(d)(14) does not revive stale state law claims acquired by the FSLIC or FDIC. *F.D.I.C. v. Belli,* 981 F.2d 838, 842 (5th Cir.1993); see also *Federal Deposit Ins. Corp. v. Hinkson,* 848 F.2d 432, 434 (3rd Cir.1988). The FSLIC acquired City and Lamar's legal malpractice claims against Shrader & York in May of 1988. Thus if City and Lamar's claims against Shrader & York expired before May of 1988, Shrader & York's statute of limitations defense is meritorious.

The Texas limitation period for legal malpractice claims is two years. Tex.Civ.Prac. & Rem.Code Ann. § 16.003 (Vernon 1986); *Willis v. Maverick,* 760 S.W.2d 642, 644 (Tex.1988). The parties do not dispute that the occurrences giving rise to the legal malpractice claims against Shrader & York took place well before May of 1986. So the claims all expired before May of 1988 unless one of the equitable doctrines urged upon us by the FDIC operates to extend the limitation period.

The FDIC argues that two equitable doctrines should extend the limitation period. First, it argues, Texas's discovery rule kept the statute of limitations from running before May of 1988. Second, it argues, the doctrine of adverse domination tolled the running of the statute of limitations.

Summary judgment is appropriate if, after discovery, there is no genuine dispute over any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), *Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); see also Fed.R.Civ.P. 56. Material facts are those that will affect the outcome of the lawsuit. *Anderson,* 477 U.S. at 247, 106 S.Ct. at 2510. A genuine dispute requires more than metaphysical doubt; there must be an issue for trial. *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1355-56. Once the moving party for summary judgment shows the absence of a material factual dispute, the burden shifts to the non-moving party to designate specific facts establishing an issue for trial. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552-53.

In Texas, the party seeking to benefit from the discovery rule "bear[s] the burden of proving

and securing favorable findings thereon." *Woods v. William M. Mercer, Inc.,* 769 S.W.2d 515, 518 (Tex.1988). A Texas rule of summary judgment procedure requires the moving party to negate the discovery rule by proving as a matter of law that no issue of material fact exists concerning when the plaintiff discovered or should have discovered its cause of action. *Woods,* 769 S.W.2d at 518 n. 2. However federal courts follow the federal rule of summary judgment procedure. *Impossible Electronic Techniques, Inc. v. Wackenhut Protective Systems, Inc.,* 669 F.2d 1026, 1036 n. 10 (5th Cir.1982); *Schultz v. Newsweek, Inc.,* 668 F.2d 911, 917 (6th Cir.1982). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue," the nonmoving party must go "beyond the pleadings" and produce summary judgment evidence designating " "specific facts showing that there is a genuine issue for trial.' " *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553 (quoting Fed.R.Civ.Pro. 56(e)). So the FDIC bore the burden of producing some summary judgment evidence in support of its discovery rule argument. See *McLaren v. Imperial Cas. and Indem. Co.,* 767 F.Supp. 1364, 1378 (N.D.Tex.1991), *aff'd in part without op.,* 961 F.2d 213 (5th Cir.1992).

## A.

In its first response to Shrader & York's limitations defense, the FDIC asserts that Texas's discovery rule kept the statute of limitations from expiring before May of 1988. Under Texas's discovery rule, the statute of limitations for legal malpractice actions does not begin to run until "the claimant discovers or should have discovered through the exercise of reasonable care and diligence the facts establishing the elements of his cause of action." *Willis,* 760 S.W.2d at 646. In *Willis,* the Texas Supreme Court noted that clients often lack the expertise to recognize a lawyer's negligence, and that "[f]acts which might ordinarily require investigation likely may not excite suspicion where a fiduciary relationship is involved." *Willis,* 760 S.W.2d at 645-46.

In Texas, a legal malpractice claim, which is based on negligence, requires proof of four legal malpractice elements: (1) the existence of a duty on the part of one party to another; (2) breach of that duty; and (3) injury (4) proximately caused by the breach. *Lucas v. Texas Industries, Inc.,* 696 S.W.2d 372, 376 (Tex.1984). Proximate cause includes foreseeability and cause in fact. *McClure v. Allied Stores of Texas, Inc.,* 608 S.W.2d 901, 903 (Tex.1980). After reviewing the record, we

conclude that the district court correctly determined that Texas's discovery rule did not keep the statute of limitations from expiring before May of 1988.

1.

Texas's discovery rule does not operate to extend the time limitation on the RDC acquisition, the 8214 Westchester transaction, the CTC acquisition, or the Stone Oak acquisition past May of 1988. The summary judgment record demonstrates that Adams was intimately familiar with these four transactions and knew the facts that the FDIC contends Shrader & York should have cautioned City and Lamar about. We conclude that Adams's knowledge should be imputed to City and Lamar. The FDIC vigorously challenges both conclusions, particularly the second.

The FDIC contends that the district court erroneously presumed that because Adams had knowledge of Shrader & York's activities he knew of Shrader & York's malpractice. The FDIC's argument assumes that Texas's discovery rule requires actual knowledge. In fact, the limitations period on a legal malpractice claim begins to run when "the claimant discovers or should have discovered through the exercise of reasonable care and diligence the facts establishing the elements of his cause of action." *Willis,* 760 S.W.2d at 646.

As the majority owner of LFC, the chairman of LFC's board of directors from January of 1983 through December of 1985, chairman of the board of directors, chief executive officer and a director of Lamar from January of 1980 through December of 1985, and sole shareholder of City from October of 1984 to December of 1985, Adams was intimately involved with the transactions at issue. In a related action, *Lamar Financial Corporation v. Adams,* No. Civ. A. A-88-CA-183 (W.D.Tex.), the FDIC's second amended complaint pled that Adams and his family were the majority shareholders of LFC during the periods relevant to this suit. It further alleges that "Adams was in control of the affairs of LFC, Lamar and City."

In *Lamar Financial Corporation v. Adams,* the FDIC accused Adams of "deliberately ... entering into unsafe and unsound transactions" that "generated no new cash to Lamar," but "dramatically increased [Lamar's] exposure to risk," and caused Lamar to sustain losses. Moreover, the FDIC pled that Adams and others "carried out a scheme" to "disguis[e] and hid[e], from

regulatory authorities, depositors, creditors and others, the negative impact of these risky loans and investments upon [Lamar's] regulatory worth." According to the FDIC's second amended complaint, one of Adams's schemes was to sell real estate securing delinquent loans and real estate acquired through foreclosure to third party "strawmen" to boost Lamar's regulatory net worth. This pattern matches the FDIC's description of the 8214 Westchester transaction. The second amended complaint further contended that Adams was involved in City's acquisition of RDC, "caus[ing]" City to purchase RDC and then "fund RDC through capital contributions in excess of $85 million."

The FDIC claims, in one breath, that Adams engaged in elaborate schemes to circumvent banking regulations. It cannot claim in the next breath that Adams was not aware that Shrader & York negligently facilitated those schemes. Thus the summary judgment evidence establishes that Adams should have discovered, through the exercise of reasonable care and diligence, the losses caused by the schemes and the other facts establishing City and Lamar's legal malpractice claims against Shrader & York. We also conclude, as a matter of law, that Adams's knowledge should be imputed to City and Lamar. This is consistent with the generally accepted rule that a bank officer or director's knowledge is imputed to the bank. *F.D.I.C. v. Ernst & Young,* 967 F.2d 166, 170 (5th Cir.1992).

Texas has applied imputation principles to determine when the statute of limitations began to run on a corporation's cause of action. *Alice Roofing & Sheet Metal Works, Inc. v. Halleman,* 775 S.W.2d 869 (Tex.App.1989) (Alice Roofing). In *Alice Roofing,* a corporation took out a loan and repaid it with corporate funds. However, the sole shareholder of the corporation used the proceeds of the loan for noncorporate purposes, thus making himself liable to the corporation. *Alice Roofing,* 775 S.W.2d at 869-70. The sole shareholder then sold the corporation to two other individuals, allegedly concealing documents evidencing his debt to the corporation. *Alice Roofing,* 775 S.W.2d at 870. When the new owners learned of the debt the corporation sued the former shareholder. *Alice Roofing,* 775 S.W.2d at 870. The court of appeals held that the statute of limitations on the corporation's cause of action began to run when the corporation took out the loan, not when the new owners learned of the debt. *Alice Roofing,* 775 S.W.2d at 870. It said: "When the 1973 transaction

took place, the corporation had full knowledge of the transaction because it was acting through [the former sole shareholder], its agent." *Alice Roofing,* 775 S.W.2d at 870.

The FDIC strenuously urges that several exceptions preclude us from applying this general rule of imputation. The FDIC first argues that we should consider its special status as successor to the FSLIC as receiver of City and Lamar and not hold it to the general rule of imputation. Next, the FDIC contends that Adams's knowledge cannot be imputed to City or Lamar because he acted adversely to their interests. Relatedly, the FDIC maintains that Adams was not disinterested. Finally, the FDIC agues that we should not apply the general rule of imputation in favor of Shrader & York because it is not an "innocent party" and had a duty to protect the thrifts from Adams's misconduct. We will consider each argument in turn.

The FDIC argues first that, as statutory representative of the insolvent institutions' creditors, it is not an ordinary assignee. Therefore, it argues, even if imputation might have been appropriate against City and Lamar, it is not appropriate against the FDIC. We rejected this argument in *Ernst & Young,* 967 F.2d at 169, 170, which involved an FDIC professional malpractice suit against a failed S & L's former outside auditor. At issue was whether the knowledge of the failed S & L's former dominating director could be imputed to the FDIC. We acknowledged that *D'Oench, Duhme & Co., Inc. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), and its progeny give specific rights to the FDIC when it seeks to recover on defaulted loans from borrowers of failed banks. However we held that "the FDIC is not entitled to special protection when it brings a tort claim against a third party on behalf of a defunct financial entity." *Ernst & Young,* 967 F.2d at 170. In reaching this conclusion, we relied on *FDIC v. Cherry, Bekaert & Holland,* 742 F.Supp. 612, 615 (M.D.Fla.1990) (Cherry), which found "no reason" to treat the FDIC "differently than any other assignee" when it prosecutes a professional liability suit. Because the FDIC could only recover " "those damages potentially available to [its] assignor,' " we held that the bank officer's knowledge, which would have been imputed to the bank, was imputable to the FDIC. *Ernst & Young,* 967 F.2d at 169, 170 (quoting *State Fidelity Mortgage Co. v. Varner,* 740 S.W.2d 477, 480 (Tex.App.1987)).

The FDIC attempts to distinguish *Ernst & Young,* arguing that, in this case, it is suing on

behalf of depositors and other creditors, not just on behalf of the failed institutions. *Ernst & Young* is indistinguishable. There, as here, the FSLIC was appointed receiver of a failed institution and transferred the institution's claims against professionals to the FSLIC-Corporate. In both cases, the FDIC acquired the claims pursuant to FIRREA. See *F.D.I.C. v. Ernst & Young,* 1991 WL 197111 (N.D.Tex.). The FDIC cites 12 U.S.C. § 1821(d)(2)(A)(i), and 12 C.F.R. §§ 549.3(a), 549.2(f) for the proposition that it may assert claims on behalf of both the insolvent institution and its creditors. The FDIC brought the same argument and the same authority to the attention of this Court in *Ernst & Young.* We rejected the FDIC's argument and concluded with respect to its malpractice suit against the failed bank's accountants that "the FDIC does not cite any statutory authority affording it special protection.' " *Ernst & Young,* 967 F.2d at 169, 170 (quoting *Cherry,* 742 F.Supp. at 614, 615). Moreover, in this case, the FDIC has not pled or offered summary judgment evidence that City and Lamar's depositors and other creditors were clients of Shrader & York, and thus able to sue Shrader & York for professional malpractice. See *Thomas v. Pryor,* 847 S.W.2d 303, 304 (Tex.App.1992) ("Under Texas law, an attorney can be held liable for professional malpractice only to a person with whom the attorney has privity, meaning to a client."); *First Mun. Leasing v. Blankenship, Potts,* 648 S.W.2d 410 (Tex.App.1983). So the FDIC fails to explain how it improves its position by standing in the shoes of depositors and other creditors. *Ernst & Young* therefore controls this issue, and we hold that imputation is appropriate in this case. If City and Lamar knew what Adams knew, before May of 1986, the FSLIC acquired only stale claims against Shrader & York when it was appointed receiver of City and Lamar.

We now turn to the FDIC's argument that Adams acted adversely to City and Lamar. As the FDIC contends, courts will generally not impute a bank officer or director's knowledge to the bank if the officer or director acts with an interest adverse to the bank. *F.D.I.C. v. Lott,* 460 F.2d 82, 88 (5th Cir.1972). The Restatement (2d) of Agency formulates the adverse interest exception as follows: "A principal is not affected by the knowledge of an agent in a transaction in which the agent secretly is acting adversely to the principal and entirely for his own or another's purposes...." Restatement (2d) of Agency § 282(1) (1957), cited with approval in *Forest Park Lanes, Ltd. v. Keith,*

441 S.W.2d 920, 931 (Tex.Civ.App.1969). According to this formulation, an agent's knowledge falls within this exception only if the agent acts "entirely for his own or another's purposes." In other words, "knowledge is imputed in a case of "joint' interests even though the agent's primary interest is inimical to that of the principal." 3 Fletcher Cyclopedia Corporations § 822 at 126 (perm. ed.). The paradigm case for applying this exception is where a bank's officer, on behalf of his bank, gives a corporation in which he has an interest a concession to which it is not entitled, such as a below-market price or rate of interest. 3 Fletcher Cyclopedia Corporations § 823 at 127.

Our understanding of this exception is further guided by three cases. The first, *Goldstein v. Union Nat. Bank,* 109 Tex. 555, 213 S.W. 584, 590-91 (1919), was cited to us by the FDIC. According to *Goldstein,* we should ask whether, under all the circumstances of the particular case,

> the agent's interests are so incompatible with the interests of his principal as practically to destroy the agency or to render it reasonably probable that an ordinary person, in the agent's position, under such circumstances, will neither act in behalf of his principal upon his so acquired knowledge, nor disclose that knowledge to his principal, but, because of such incompatibility in interests, will withhold knowledge from the principal.

*Goldstein,* 213 S.W. at 590-91. It is "inaccurate" and goes "too far" to say that the exception involving adverse interest applies if "the individual interests of an agent are to any extent adverse to that of his principal." *Goldstein,* 213 S.W. at 590.

Second, we look to our recent decision in *Ernst & Young,* 967 F.2d at 168-71. In that case the FDIC, as receiver of a failed savings and loan, sued the S & L's outside auditor for professional malpractice. *Ernst & Young,* 967 F.2d at 168. The S & L's sole shareholder, who was also its chairman of the board and chief executive officer had brought losses to the S & L through fraudulent and illegal activities. *Ernst & Young,* 967 F.2d at 168. Those activities included pursuing "complex commercial ventures that were often based on unsafe and unsound underwriting practices," entering into transactions that generated "paper profits, making [the S & L] appear solvent," making false entries in the S & L's books "with intent to deceive [the S & L's] board and government regulators," conspiring to misapply the S & L's funds, and "numerous violations of Bank Board regulations." *Ernst & Young,* 967 F.2d at 168.

In *Ernst & Young,* we explained that facts acquired by the officer committing fraud against

the corporation are not imputed to the corporation. We applied an explanation of "fraud against the corporation" given in *Cenco Inc. v. Seidman & Seidman,* 686 F.2d 449 (7th Cir.), *cert. denied,* 459 U.S. 880, 103 S.Ct. 177, 74 L.Ed.2d 145 (1982). We explained that "fraud against the corporation usually hurts just the corporation; the stockholders are the principal if not only victims...." *Ernst & Young,* 967 F.2d at 171. On the other hand, we explained, "fraud for the benefit of the corporation" primarily benefits the corporation's stockholders and injures "outsiders to the corporation." *Ernst & Young,* 967 F.2d at 171. Applying this explanation, we held that the officer's knowledge should be imputed to the S & L: the officer "acted on the corporation's behalf because by serving [the S & L], he served himself, [the S & L's] sole owner. As the sole owner, [the officer's] fraudulent activities on [the S & L's] behalf benefitted himself and injured ... depositors and creditors." *Ernst & Young,* 967 F.2d at 171.

In *Cenco,* insiders of a corporation were "deeply involved" in a "massive fraud" that consisted mainly of "inflating inventories in the Medical/Health Division far above their actual value." *Cenco,* 686 F.2d at 451. This fraud increased Cenco's apparent worth, as well as the market price of its stock. *Cenco,* 686 F.2d at 451. Thus, Cenco was able to "buy up other companies on the cheap" as well as "borrow money at lower rates than if its inventories had been honestly stated." *Cenco,* 686 F.2d at 451. In the litigation that followed discovery of the fraud, the company asserted a cross claim against its independent auditor for failing to prevent the fraud. *Cenco,* 686 F.2d at 451. The Seventh Circuit said that the fraud was on behalf of the corporation: "those involved in the fraud were not stealing from the company, as in the usual corporate fraud case, but were instead aggrandizing the company (and themselves) at the expense of outsiders...." *Cenco,* 686 F.2d at 451, 456.

At trial, to successfully establish that Adam's knowledge of the fraudulent activity was not imputed to the corporation under the discovery rule, the FDIC would have to prove that Adams acted adversely to or committed fraud against City and/or Lamar. Therefore, to avoid summary judgment dismissal, it bore the burden of producing some summary judgment evidence in support of this argument.

The summary judgment evidence indicates that Adams misappropriated funds in connection

with the Brazos merger.[3]  However the FDIC did not offer summary judgment evidence that Adams embezzled, looted, or otherwise personally profited at the expense of City or Lamar in connection with the other four transactions.  The five transactions at issue are independent.  So Adams's possible adverse interest in one transaction does not spill over into other transactions for purposes of the imputation rule.

The FDIC urges us to infer that Adams breached his fiduciary duty to the institutions' depositors and creditors.  Creditors were injured when Adams's frauds were uncovered.  However, *Cenco* and *Ernst & Young* teach that fraud on behalf of a corporation, as opposed to fraud against the corporation, almost always injures a corporation's creditors.  *Ernst & Young,* 967 F.2d at 171, *Cenco,* 686 F.2d at 456.

The FDIC also argues from the summary judgment evidence that Adams fraudulently inflated Lamar's regulatory net worth, and that he concocted sham transactions to deceive federal regulators so that he could retain his control over the institutions.  However, the summary judgment evidence indicates that any fraudulently inflated profits went on the books of Lamar and City, not into Adams's personal account.  Adams's desire to maintain control over City and Lamar, by itself, does not bring Adams's conduct within the adverse interest exception, under any of the formulations we have discussed.

An examination of the individual transactions reveals the inadequacy of the FDIC's summary judgment evidence on this issue.  Concerning the RDC transaction, the FDIC alleges that City paid too much for a worthless asset in order to bypass regulations forbidding City from "upstreaming" capital to LFC.  The FDIC's complaint can be broken down into two elements:  that City paid too much for RDC, and that City gave $10 million to its sole shareholder, LFC.[4]  The FDIC does not present evidence raising a fact question of whether Adams personally profited from City getting a bad

---

[3]Because the Brazos merger was unusual in this respect, we discuss it in the next section of this opinion.

[4]The number is closer to $8.5 million.  The FDIC's second amended complaint in *Lamar Financial Corporation v. Adams* claimed that, by the Fall of 1983, LFC had repurchased the stock held by RDC's principals for approximately $1.5 million.

deal on RDC. The FDIC's pleadings suggest that Adams, as majority owner of LFC, might have personally benefitted from City's capital contribution to LFC. However the upstreaming violation did not change the value of LFC's total assets. So the value of Adams's LFC stock presumably did not increase either. If the upstreaming violation rendered City undercapitalized, it may have given Adams an advantage over City's creditors. But the FDIC has not produced summary judgment evidence that the transaction left City undercapitalized. Moreover, as we have explained, an advantage over creditors does not come within the adverse interest exception. *Ernst & Young,* 967 F.2d at 171. *Ernst & Young* is made more applicable to this transaction by the fact that Adams acquired 100% of City's stock in December of 1985. After October of 1986, Adams was no longer City's sole shareholder. However, we cannot say that City, at that point, ceased to know what it already knew. *Alice Roofing,* 775 S.W.2d at 870.

Concerning the 8214 Westchester transaction, the FDIC alleges that Lamar lost $4.5 million trying to hide a bad loan from federal regulators through a series of sham transactions. This attempt to make it appear that Lamar had a positive net worth resembles the frauds in *Ernst & Young* and *Cenco. Ernst & Young,* 967 F.2d at 171; *Cenco,* 686 F.2d at 451. Again the FDIC fails to offer evidence that Adams personally profited from this transaction at Lamar's expense. The inflated net worth went on to Lamar's books, not into Adams's personal account.

The FDIC also fails to meet its burden with respect to Lamar's direct investments into CTC and Stone Oak. The FDIC alleges that Lamar directly invested in CTC and Stone Oak when its capital was too low to lawfully do so. If these ventures had succeeded, Lamar, not Adams, would have reaped the profits. Although hindsight reveals that Lamar paid too much for its investments, the summary judgment evidence does not allow an inference that Adams personally profited from Lamar's unwise investments.

Moreover, the record shows that federal regulatory officials made Lamar's board aware of the regulatory violations. In June of 1985, LFC received a letter from the FHLBB expressing "concern with [Lamar's] financial condition." The letter explained that Lamar had a current negative net worth and was losing "approximately $1,000,000" per month. The FHLBB explained that it would request

a supervisory agreement if LFC did not infuse Lamar with new capital or take other steps to correct the problem.

In November of 1985 Lamar received another letter from the FHLBB. That letter explained that Lamar had "failed to meet its net worth requirements." In the letter, the FHLBB made clear that it considered unauthorized direct investments during the quarter following June 30, 1985 a "direct violation of the Insurance Regulations." It further explained that Lamar's "failure to maintain an adequate level of net worth" was "exacerbated by investment in acquisition, development, and construction loans and real estate that is substantially higher than the national average for such investments." The FHLBB prohibited direct investments made without prior written approval of the Supervisory Agent. These letters bolster our conclusion that Lamar should have discovered the facts establishing any possible malpractice claims against Shrader and York arising out of the CTC and Stone Oak investments.

We next consider the FDIC's argument that Shrader & York is not entitled to the benefit of the general rule of imputation because it is not an innocent party and had a duty to protect City and Lamar from Adams's misconduct. Application of such an exception would require a showing that Shrader & York colluded with Adams to defraud City and Lamar. *See, e.g., Crisp v. Southwest Bancshares Leasing Co.,* 586 S.W.2d 610, 615 (Tex.Civ.App.1979) ("The [imputation] rule is for the protection of innocent third parties and does not protect those who collude with the agent to defraud the principal.") (emphasis added). The FDIC has not alleged or produced summary judgment evidence that Shrader & York colluded with Adams, or that it did so to defraud City and Lamar. It has only alleged that Shrader & York performed its duties negligently. This argument therefore has no merit.

### 2.

We also affirm the district court's ruling as to the malpractice claims arising out of the Brazos merger. The FDIC claims that Adams used the Brazos merger to waste millions of dollars of Lamar assets. So Adams's knowledge with respect to this transaction might not be imputable to Lamar. Still, the record reveals that Lamar's Board of Directors had a considerable amount of concrete

information about the Brazos merger that should have put it on notice of potential legal malpractice claims arising out of Shrader & York's work on that merger. In November of 1983 Lamar's board received a letter from Peat Marwick, the accounting firm that represented Brazos in the merger. The letter pointed out that "[G]eneral and administrative expenses for the [April 1, 1983-June 30, 1983] period were approximately $9.2 million (unaudited), as compared to approximately $1.2 million (unaudited) for the prior three-month period." Commenting on the unusual nature of the expenses, the letter noted that some of the "$9.2 million was expended on automobiles for the benefit of certain directors, officers, or employees of Lamar and Brazos." The letter drew attention to fact that the merger agreement between Lamar and Brazos forbade salary increases outside the ordinary course of business. Peat Marwick considered this activity so serious that its earlier report of July 5, 1983 could "no longer be relied on."

The FDIC argues that a subsequent investigation of the expenses, conducted by the outside law firm of McKenna, Connor & Cuneo, did not accuse Shrader and York of any wrongdoing. The scope of the investigation included "the records" of Lamar and Brazos relating to the acquisition of Brazos by Lamar, and the "related public disclosures and filings with the Bank Board." The outside law firm was to "prepare a report of its investigation and recommendations to correct improper actions to the board of directors." Even though the investigation's scope was potentially expansive, the investigation focused mainly on the actions of Lamar and Brazos insiders. We still conclude that a reasonable person, armed with this information, exercising reasonable care and diligence, would have discovered facts establishing Lamar's causes of action against Shrader and York.

B.

The FDIC argues that Adams adversely dominated City and Lamar, and that, therefore, City and Lamar's causes of action against Shrader and York did not begin to run until Adams lost his grip on City and Lamar. Because the FDIC is suing the corporations' outside counsel, and not their officers or directors, the district court declined to apply the adverse domination doctrine.

This very narrow doctrine has been applied to suits by a corporation against the officers or directors of that company. In appropriate cases, it tolls the statute of limitations for claims against

wrongdoing officers and directors of a corporation until they relinquish control of the institution. *F.D.I.C. v. Howse,* 736 F.Supp. 1437, 1442 (S.D.Tex.1990). The doctrine's primary policy rationale is that a wrongdoing corporate officer or director will seek to hide his or her wrongful conduct from the corporation. *Howse,* 736 F.Supp. at 1442.

The FDIC contends that the adverse domination doctrine is not limited to suits against a corporation's officers and directors. In the FDIC's view, the policy rationale for the doctrine applies in this case because Adams prevented City and Lamar from suing Shrader & York in order to avoid exposure of his own wrongdoing.

The FDIC has not produced any cases from Texas or this Court that extend the adverse domination doctrine beyond corporate officers and directors. Moreover, the FDIC does not allege that Shrader and York committed intentional torts, or conspired with Adams to defraud City or Lamar. Thus we agree with the district court that, in this particular case, Texas's discovery rule adequately addresses the FDIC's policy concern.

IV.

For the reasons stated above, we AFFIRM the district court's order.

AFFIRMED.